SALYER GRAIN AND MILLING COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Salyer Grain & Milling Co. v. Commissioner
Docket No. 21449-80.
United States Tax Court
T.C. Memo 1986-165; 1986 Tax Ct. Memo LEXIS 444; 51 T.C.M. (CCH) 919; T.C.M. (RIA) 86165; April 22, 1986. Gary S. Vandeweghe, for the petitioner. Catherine L. Wong and Alan Summers, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in petitioner's Federal income tax in the amount of $288,000 for taxable year 1974. After concessions, the issue for decision is whether $600,000 of a $1.4 million payment by petitioner to Fred Greer constitutes consideration for the cancellation of an employment contract or whether all of the $1.4 million payment is allocable to a sale of stock. Petitioner claimed $600,000 as an ordinary and necessary business expense on its July 30, 1977 fiscal year tax return. This in turn resulted in a NOL carryback to petitioner's 1974 tax return which was disallowed by respondent. FINDINGS OF FACT Some of the *445 facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner, Salyer Grain and Million Co., is a California corporation which had its principal place of business in Corcoran, California at the time the petition was filed. At all times relevant to this proceeding, brothers Fred Salyer (Fred) and Everette C. Salyer (Everette) were principal stockholders and officers of petitioner and Salyer Land Co. (Salyer Land). On July 22, 1972, Thomas Keister Greer, Esquire (Greer) purchased 85 shares of Salyer Land stock and 34,553.8 shares of petitioner's stock. Also on July 22, 1972, Greer entered into an employment contract with petitioner and Salyer Land. Under this contract Greer, an attorney who had been representing the two corporations since 1957, agreed to devote all of his professional time to petitioner and Salyer Land in exchange for a permanent retainer of $100,000 a year, to continue for as long as he lived provided that he could be retired at any time at one-half of that sum, and a twenty-year retainer of $65,000 a year. If Greer sold his stock in Salyer Land all obligations to pay *446 retainers, retirement income or pension would cease. Sometime in 1975, differences arose between Greer and the Salyer brothers which led Greer to decide that he no longer wished to be a shareholder. During 1975 and early 1976 negotiations were conducted directly between Greer and the Salyer brothers regarding the sale to petitioner by Greer of the stock he acquired in 1972. In the spring of 1976, petitioner consulted Mr. John Penn Lee with respect to this matter. Mr. Lee, an attorney with a Master of Laws in Taxation, had been working on tax matters for petitioner. In March 1976, Greer hired Baxter Richardson, Esquire, an attorney and a certified tax specialist, to represent him in this matter. On July 17, 1976, petitioner sent a letter to Greer which stated: The Executive Committee of the Board of Directors of the Salyer Grain & Milling Company hereby offer to redeem and purchase your stock in the Salyer Grain & Milling Company and Salyer Land Company for the sum of $1.4 million. The company is advised that the stock's actual market value is less than such figure but, in view of the threatened litigation and the disruptive effects on company operation and its personnel, *447 the Executive Committee feels the offer is in the company's best interest. This offer is conditioned upon your resignation as a director of the companies and a release of all claims against Salyer Land Company, Salyer Grain & Milling Company, and the officers, shareholders, attorneys, accountants and personnel of both companies. * * * Greer initially rejected the offer but subsequently accepted it. Lee never proposed a value for the employment contract and the subject of an allocation was not brought up between the parties. Greer instructed Richardson that all of the $1.4 million payment was to be in payment for stock. Greer would not have accepted this amount if he had known petitioner would allocate $600,000 to the employment contract. On July 28, 1976 at 9:30 a.m. petitioner's Executive Committee of the Board of Directors held a special meeting at the airport in Fresno, California. As stated in the minutes, the purpose of the meeting was to review the negotiations with Greer and to vote on the offer of Greer to sell his stock for a total price of $1.4 million. At the end of the special meeting petitioner's Executive Committee adopted the resolution that: RESOLVED, *448 that upon Thomas Keister Greer's warranty to the Company that he is the sole owner of the stock; that the Salyer Grain & Milling Company accept the offer of Thomas Keister Greer to sell and the Company to purchase his stock in the Salyer Land Company and the Salyer Grain & Million Company, being 85 shares and 34,554.8 shares, respectively, for a total price of 1.4 million dollars; and BE IT FURTHER RESOLVED, that the Company accept Thomas Keister Greer's resignation as one of its Officers and Directors; and BE IT FURTHER RESOLVED, that the Company, in conjunction with the Salyer Land Company, terminate the employment contract with Thomas Keister Greer, and in the future employ him on a case by case basis, at an hourly rate, as negotiated from time to time by the parties, billable monthly. Shortly thereafter on July 28, 1976, at Richardson's offices, petitioner and Mr. and Mrs. Greer entered into an Agreement and Escrow Instructions. This agreement in pertinent part provides: PARTIES: The parties to this agreement are THOMAS KEISTER GREER, sometimes hereinafter referred to as "GREER," and SALYER GRAIN & MILLING COMPANY, a corporation, hereinafter sometimes called the "Corporation. *449 " RECITATIONS: 1. GREER owns 85 shares of the capital stock of SALYER LAND COMPANY and 34,553.8 shares of the capital stock of Corporation. GREER desires to sell to Corporation and Corporation to purchase from GREER all of such shares. 2. The parties desire to arrange for the termination of that certain contract of July 22, 1972, between THOMAS KEISTER GREER, therein referred to as "Tom," SALYER LAND COMPANY, therein referred to as "Land Company," and SALYER GRAIN & MILLING COMPANY, therein referred to as "Milling Company," providing for the rendition of certain legal services by Tom to said corporations and payments by them. 3. The parties further wish to provide for resolution of all disputes or claims as between them and also other parties related to Corporation. AGREEMENT: In consideration of the premises, the parties agree as follows: 1. SALE AND PURCHASE OF STOCK. (a) GREER agrees to sell to Corporation and Corporation to purchase from GREER, for a total consideration of $1,400,000.00, 85 shares of capital stock of SALYER LAND COMPANY and 34,553.8 shares of the capital stock of Corporation[.] Such shares are all the issued and outstanding capital stock of *450 said two corporations owned by GREER. To carry out such sale and purchase, an escrow shall be forthwith established and promptly closed as provided in paragraph 2 below. * * * 2. ESCROW. To carry out the transaction for sale and purchase of shares provided for in paragraph I above, an escrow shall be forthwith opened with RICHARDSON AND GASKILL, Attorneys, 914 Helm Building, Fresno, California 93721. GREER shall promptly deposit in such escrow the following: (1) Assignments separate from certificates covering all certificates evidencing the shares of stock which are the subject matter of the transaction of sale and purchase. (2) Release, in form satisfactory to counsel for the Corporation, of the Corporation, SALYER LAND COMPANY, EVERETTE SALYER, FRED SALYER, BASIN FARMS, a corporation, JOINT VENTURE B, a joint venture, SALYER FARMS AIRPORT, a corporation, SALYER FARMS, a partnership, and SALYER LEASING COMPANY, a partnership, and their personnel, accountants and counsel. Such release shall specifically, without limitation upon the generality of the effect thereof, be a release of all obligations of any of the parties under the said contract of July 22, 1972, between THOMAS *451 KEISTER GREER, SALYER LAND COMPANY and SALYER GRAIN & MILLING COMPANY. Paragraph 1(a) as originally drafted by Richardson contained at the end of the first sentence after "Corporation" the words "allocable $     to said 85 shares of Salyer Land Company and $     to said 34,553.8 shares of Corporation." These words were deleted and initialled by the parties on July 28, 1976. Mutual releases were executed by the parties, releasing each other from various claims and obligations, including the obligations under the employment contract. While Lee negotiated on behalf of petitioner he did not execute the Agreement because he was away taking the California bar examination. Gary Vandeweghe, an attorney with a principal part of his practice in the area of tax law, reviewed the documents on petitioner's behalf. Vandeweghe had been informed by Lee as to the progress of the negotiations. Petitioner wanted to retain Greer on a case by case basis in order to continue Greer's representation in eight cases which were in the midst of litigation. The parties executed an agreement later in the day of July 28, 1976, which was not reviewed by petitioner's counsel, which set forth the terms *452 of Greer's continued representation. The first paragraph of this agreement contained in a letter from Greer to petitioner states the following: As of the date hereof that contract for legal services of July 22, 1972, by and between Salyer Land Company, Salyer Grain & Milling Company, and Thomas Keister Greer has been terminated. The consideration moving from me to you for such termination is my agreement, evidenced by a separate release document executed by my wife and myself, that you are released from any and all further liability for any payment whatsoever under that agreement, accruing after the date hereof. The consideration moving from you to me for such termination is that you have released me from any and all liability to perform further and exclusive services as required therein. No IRS Form 1099 or the like, such as a Form W-2 was ever issued to Greer by petitioner, informing Greer that petitioner was treating $600,000 of the $1.4 million as payment for his employment contract. In June 1977, petitioner consulted Richard Firestone, an actuary, to give an opinion as to the present value of the future payments due under the employment contract. Firestone estimated the *453 present value to be between $1.4 million and $1.6 million. OPINION The issue for decision is whether any portion of the $1.4 million paid by petitioner to Greer pursuant to the agreement of July 28, 1976, constituted consideration for the cancellation of the employment contract. Petitioner contends that $600,000 of the $1.4 million is allocable to the contract and that this amount is deductible as an ordinary and necessary business expense under section 162. Petitioner argues that the agreement contains no allocation of the $1.4 million. Because the parties failed to agree to an allocation and the employment contract has some value, an amount of $600,000 should be so allocated. Respondent, on the other hand, contends that none of the $1.4 million is allocable to the employment contract. Respondent claims that the agreement unequivocally allocated all of the $1.4 million to the purchase of the stocks and that petitioner has failed to establish that the parties intended to allocate any portion to the employment contract. We agree with respondent that the terms of the written agreement are clear that no amount of the purchase price is to be allocated to the employment contract. *454 Paragraph one of the Agreement and Escrow Instructions specifically states that the sum of $1.4 million is the total consideration for the stocks. The agreement subsequently provides under the escrow instructions in paragraph two that the parties would release each other from all obligations under the employment contracts. No other consideration is specified for the termination of the employment contract. Where the taxpayer has executed a written agreement that provides for the specific terms of a transaction in which the tax consequences are at issue, he must adduce "strong proof" to establish a position at variance with the clear language of his written agreement. . [1] The taxpayer must show by such proof that the asserted allocation better represents the intention of the parties and the underlying economic realities. ; . *455 Petitioner has failed to show that the parties intended to allocate any portion of the $1.4 million to the cancellation of the employment contract. The agreement itself does not assign any value to the termination of the contract. This fact alone is good evidence that none was intended. . , affd. on another issue sub nom. . Both parties were represented by experienced counsel who understood the tax ramifications of the agreement. The evidence is clear that Greer would have requested a larger sum of money if any allocation had been made to the employment contract. The record is also clear that the parties never discussed any allocation of money to the contract. The fact that the parties disagreed about the allocation of the $1.4 million between the two stocks does not show, as petitioner contends, that the parties disagreed about the allocation to the employment contract. The parties never discussed an allocation to the employment contract. The *456 letter of July 17, 1976 written by Everett Salyer to Greer offering $1.4 million for the stock does not mention the employment contract. This focus on the sale by the parties is understandable inasmuch as the employment contract would automatically terminate with the sale. The resolution adopted by petitioner's Executive Committee on the same day that the written agreement was signed also reflects that the entire $1.4 million was to represent the purchase price for the stock. The letter of July 28, 1976, written by Greer to petitioner, specifically recites the mutual releases from the employment contract as separate independent consideration. Although this agreement was not reviewed by petitioner's counsel, it is consistent with the written agreement executed earlier. After execution of the agreement, petitioner unilaterally allocated almost one-half of the purchase price to the employment contract on its tax return. Such an allocation, which was to petitioner's advantage and to Greer's disadvantage, was done without his knowledge or consent. Petitioner has also failed to show that the agreement does not comport with economic reality. Petitioner's expert estimated the present *457 value of the future payments due under the employment contract to be approximately $1.4 million to $1.6 million. While this report may be a reasonable estimate of the present value of future payments, we do not believe that we are bound to accept this valuation as proof as to what the value of the termination of the employment contract was to the parties. To so accept this value would result in no portion of the purchase price being attributable to the stocks. Also, the report does not take into account the terminating clause in the employment contract nor does it take into account the value to Greer of allowing him to pursue other professional endeavors. By the execution of the mutual releases, petitioner was no longer obligated to pay Greer retainers and Greer, in turn, was released from his obligation to provide services to petitiooner. Petitioner principally relies on and . The former involved the sale of an insurance agency. Under the terms of the contract of sale Mr. Kinney transferred to the purchaser the office furniture and fixtures, the goofwill of *458 the agency, the right to use the agency name, the right to the expirations of all insurance policies written by the agency and a covenant not to compete.The purchaser agreed to pay $5,000 for the office furniture and fixtures, $10 for goodwill, $10 for use of the agency name and $125,000 as the balance of the amount payable by the purchaser. Petitioner Kinney argued either no amount or a nominal amount was allocable to the covenant not to compete, while respondent argued that the covenant not to compete had independent economic significance and that a major portion of the purchase price was allocable thereto. This Court found that the parties failed to allocate any of the consideration to the covenant because they could not agree on the amount to be allocated: Since the failure to allocate was due to such disagreement between the seller and the purchaser, the absence of the allocation does not indicate that they considered the covenant to have no value. * * * As a party is not attempting to very the language of the agreement, we do not have a situation in which the "strong proof" test is applicable. * * * [.] Here, however, we do have a party *459 attempting to vary the written agreement which expressly allocates the entire amount to the stocks. Petitioner has failed to adduce strong proof to warrant an allocation of the payment to the termination of the employment contract. Petitioner also relies on In that case, the taxpayer entered into 20-year employment contracts with TSI, a life insurance and real estate holding company in 1966 and with TNLI, an insurance company and subsidiary of TSI, in 1964. The contracts provided for certain payments to the taxpayer if the contracts were terminated. The taxpayer and his family also owned a 15 percent stock interest in TSI. In 1969, American Pyramid Cos., Inc. (American) initially proposed to purchase the stock from the taxpayer for $2.75 a share, to settle the employment contracts for $300,000 and to retain the taxpayer as a part-time employee. The taxpayer agreed in principle to this proposal subject to receiving his counsel's opinion. More negotiations were conducted and a second offer was made. American would purchase the stock for $4.00 a share and the taxpayer would release American from the employment contracts. An agreement *460 was written covering the sale of the taxpayer's stock to American. There was no discussion with respect to how the purchase price was to be allocated. The taxpayer reported capital gain on the stock based on the amount realized of $4 a share. Respondent determined that $300,000 of the amount realized represented consideration for the cancellation of the employment contracts and, accordingly, decreased the taxpayer's capital gain and increased ordinary income. This Court stated: When the terms of an agreement result from deliberate negotiations this Court is not prone to give it a different interpretation. However, when the agreement neither conforms to the business or economic realities of the situation nor is the product of conflicting tax interests, we believe it is appropriate for this Court to examine the surrounding circumstances and make our own determination. * * * [Citations omitted; emphasis added. 34 T.C.M. at 820; 44 P-H Memo T.C. at 802-75.] The lack of agreement about the allocation was due at least in part to the fact that American did *461 not have a stake in the allocation of the purchase price. Here, the parties had directly competing tax interests and were represented by counsel who understood the tax consequences. We are, therefore, unwilling to upset the bargain they made in light of the lack of strong proof that the agreement does not conform to business or economic reality. We believe the facts in this case are more analogous to those in , affd. sub nom. , where the taxpayer company purchased stock from a minority shareholder group of Penndale, Inc. The group included William Schull who had an employment contract with Penndale. The parties agreed to a lump-sum figure of $350,000 which was divided amongst the individuals in the shareholder group according to their stock interest. A written agreement was executed for the sale of stock which stated the consideration of $350,000. As part of the same transaction the taxpayer and Scull executed a second agreement terminating Scull's employment contract. After execution of the agreement, Penndale's board of *462 directors unilaterally resolved that the company purchase Scull's contract for $109,000. Penndale then allocated $109,000 of the $350,000 stock purchase price to the cancellation of the employment agreement and accrued that amount as an expense on its book. Schull attributed his share of the entire purchase price to the stock purchase and reported capital gain accordingly. In , this Court found as a fact that none of the $350,000 purchase price was allocable to the employment contract. In , the same finding was made. The manner in which the lump-sum figure was distributed among the shareholders including Scull according to their respective stock interests, was a factor in this decision. Another factor, however, was that there was no consideration stated for the employment contract except the signing of mutual releases. The company was relieved of the obligation to pay Scull the money each year and Scull was free to pursue the outside interests he had acquired. The company's counsel was aware that if they amended the agreement to alter its tax consequences *463 the sale might fall through--"the contemplated tax results were actually part of the bargain." The board's action in unilaterally assigning an amount to the employment contract without furnishing a Form 1099 to Scull was not the result of an agreement between the parties that any of the purchase price was allocable to the cancellation of the employment contract. Here, the stated consideration for cancellation of the employment contract was the signing of the mutual releases. If petitioner had attempted to alter this agreement by allocating a portion to the contract, Greer would have requested more money. The unilateral action of petitioner in assigning an amount to the employment contract in no way reflected the agreement of the parties. In sum, the agreement is clear and unambiguous. The entire $1.4 million is allocable to the purchase price of the stock. The record does not justify amending this agreement executed by the parties who negotiated at arm's length, who had conflicting tax interests and who were represented by tax counsel. Accordingly, we sustain respondent's determination. Decision will be entered for respondent.
Footnotes
1. Respondent urges us to apply the parol evidence rule to exclude all extrinsic evidence which would alter or contradict the terms of the agreement and, in the alternative, to apply the standard of proof adopted by the Third Circuit in , vacating and remanding , that: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [] The Danielson rule encompasses the parol evidence rule. See ; , affd. sub nom. . The present case is appealable to the Ninth Circuit which has applied the strong proof rule. affg. . The Ninth Circuit has suggested subsequently that it might apply a stricter standard of proof akin to Danielson., affg. in part and revg. in part a Memorandum Opinion of this Court; , affg. a Memorandum Opinion of this Court. However, this question was expressly left open in . This Court has not adopted the Danielson↩ rule. See . In light of our preference for the strong proof rule we have continued to apply it in cases appealable to the Ninth Circuit. . The result in this case is the same under either rule.